**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OBED B. QUINTERO, | Case No. EDCV 17-0435 SS |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| NANCY A. BERRYHIL,[1] Acting Commissioner of the Social Security Administration, | |
| Defendant. | |

**I.**

**INTRODUCTION**

Plaintiff Obed B. Quintero ("Plaintiff") brings this action seeking to overturn the decision of the Commissioner of the Social Security Administration (the "Commissioner" or the "Agency") denying his application for Supplemental Security Income ("SSI").

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security and is substituted for former Acting Commissioner Carolyn W. Colvin in this case. See Fed. R. Civ. P. 25(d).

(Dkt. No. 8).  Alternatively, he asks for a remand.  (Id.).  On March 13, 2017, Plaintiff filed a complaint (the "Complaint") commencing the instant action.  (Id.).  On July 27, 2017, Defendant filed an Answer to the Complaint (the "Answer").  (Dkt. No. 19).  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. Nos. 12, 14).  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

## PROCEDURAL HISTORY

On August 29, 2013, Plaintiff filed an application for SSI under Title XVI.  (Administrative Record ("AR") 75, 180).  Plaintiff's application alleges disability beginning on February 22, 2013 due to "major depression, pain in abdomen, fatigue, prolonged symptoms such as blood in stool, knee and hip and back pain, [and] sleep apnea."  (AR 75, 215).  Plaintiff's SSI application was denied both initially on January 10, 2014 and upon reconsideration on March 14, 2014.  (AR 103-06, 110-14).

On March 26, 2014, Plaintiff requested a hearing by an Administrative Law Judge ("ALJ").  (AR 115-17).  The hearing took place in Moreno Valley, California on August 27, 2015 with ALJ Andrew Verne presiding.  (AR 37-74).  On October 28, 2015, ALJ Verne issued an unfavorable decision, finding Plaintiff able to perform "a range of light work."  (AR 16-36).  On November 5, 2015, Plaintiff requested review of the ALJ's decision before the Appeals

Council.  (AR 15).  On January 26, 2017, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner.  (AR 1-7).

**III.**

**FACTUAL BACKGROUND**

Plaintiff was born on June 29, 1964 and was 49 years old at the alleged onset date of disability on August 29, 2013.  (AR 75).  Plaintiff stopped working on that date.  (AR 215).

A.  <u>Plaintiff's Medical History[2]</u>

On December 16, 2011, Plaintiff went to the Emergency Room at Menifee Valley Medical Center.  (AR 285).  He complained of rectal bleeding, fleeting abdominal pain and feeling weak throughout his body.  (AR 285).  The doctor noted Plaintiff weighed approximately 247 pounds.  (AR 285).  Plaintiff's height is approximately six feet.  (AR 315).  The doctor also noted a history of hypertension and gallbladder disease with gallstones.  (AR 285).  Plaintiff stated that he was not taking any medications. (AR 286).  He also reported smoking at least one pack of cigarettes per day.  (AR

---

[2] Plaintiff also alleged mental impairments and other physical impairments.  However, in his brief before this Court, Plaintiff only challenges the ALJ's consideration of treating physician Dr. Sharif's opinions.  Accordingly, the Court limits the medical history discussion to that history which is relevant to Dr. Sharif's opinions.

286).  Plaintiff presented with a blood pressure of 201/104 mmHg. (AR 286).  He also had visible hemorrhoids.  (AR 286).  The doctor assessed Plaintiff with "hemorrhoidal bleeding, rectal; and hypertension, acute."  (AR 287).  Plaintiff received treatment for the hypertension.  (AR 287).  The doctor prescribed blood pressure medication and gave Plaintiff instructions on hemorrhoids, high blood pressure, and blood pressure medication.  (AR 287, 289-94).

On August 20, 2012, Plaintiff went to the Emergency Room at Riverside County Regional Medical Center.  (AR 370).  Plaintiff complained of chest pain, anxiety, blurry vision and fatigue.  (AR 393).  He reported he ran out of blood pressure medication two weeks earlier.  (AR 393).  The doctor refilled his blood pressure medication.  (AR 395).

Plaintiff first sought treatment for knee and hip pain at the Family Care Clinic at Riverside County Regional Medical Center on November 16, 2012.  (AR 388).  He complained of pain in his right knee and hip.  (AR 388).  The doctor ordered x-rays of Plaintiff's right knee and hip.  (AR 388).  The doctor also prescribed tramadol for pain after Plaintiff stated he did not want a narcotic.  (AR 388, 390).

On April 2, 2013, Plaintiff went to the Emergency Room at Menifee Valley Medical Center.  (AR 297).  He complained of pain in his right flank radiating from his back into his groin area. (AR 297).  The doctor noted a history of kidney stones and hypertension.  (AR 297).  A CT scan revealed Plaintiff had a 5 mm

ureteral stone near mid pelvis on his right side. (AR 298). The doctor diagnosed Plaintiff with right ureterolithiasis and treated him. (AR 298). The Radiology Report on Plaintiff's CT scan further concluded Plaintiff had colonic diverticula without inflammation, multiple small kidney stones and gallbladder stones. (AR 305-06). The doctor prescribed an antibiotic and Lortab and gave Plaintiff instructions on the medications. (AR 298, 307-10).

On April 18, 2013, Plaintiff went to the Emergency Room at Menifee Valley Medical Center. (AR 312). He complained of pain in his right flank area again. (AR 312). The doctor diagnosed him with a kidney stone on his right side. (AR 313). The doctor treated him and discharged him. (AR 313).

On April 22, 2013, Plaintiff sought treatment at the Family Care Clinic at Riverside County Regional Medical Center. (AR 382). Plaintiff complained of pain from kidney stones. (AR 382). The clinic prescribed medication. (AR 383-87).

On April 30, 2013, Plaintiff went to the Family Care Clinic at Riverside County Regional Medical Center. (AR 370). Plaintiff had a follow-up visit since he was previously diagnosed with kidney stones. (AR 370). The doctor found Plaintiff's musculoskeletal and psychiatric presentations were normal. (AR 371). The doctor also ordered a sleep study and managed Plaintiff's medications. (AR 372).

On May 15, 2013, Plaintiff sought treatment at the Family Care Clinic at Riverside County Regional Medical Center. (AR 374). Plaintiff complained of blood in his stool and fatigue. (AR 374). The clinic refilled his medication. (AR 376). He also underwent ultrasounds of his bladder and pelvis as well as his abdomen. (AR 410-11). The ultrasound of his bladder and pelvis revealed no abnormal findings. (AR 410). The ultrasound of his abdomen revealed an enlarged liver and gallbladder stones. (AR 411).

On June 4, 2013, Plaintiff went to the Family Care Clinic at Riverside County Regional Medical Center. (AR 365). He requested refills of his pain and hypertension medications. (AR 365). Plaintiff reported using an antidepressant. (AR 365). The doctor noted Plaintiff was negative for joint pain and had normal psychiatric findings. (AR 366). The doctor refilled Plaintiff's medication but also changed his medications because he was not experiencing renal issues. (AR 367). On July 17, 2013, Plaintiff underwent a sleep apnea assessment. (AR 794). The test concluded that Plaintiff has sleep apnea. (AR 794).

On July 9, 2013, Plaintiff went to the Emergency Room at Riverside County Regional Medical Center. (AR 353). He requested a refill of his pain and hypertension medication. (AR 353). The doctor partially refilled Plaintiff's medication but directed him to follow up with his primary care provider. (AR 353). The doctor noted lower back and hip pain. (AR 353). On July 11, 2013, a medical summary was prepared by the Gastro-Enterology department. (AR 363). In that summary, it was reported that Plaintiff smoked

a pack of cigarettes daily, used alcohol occasionally, and used marijuana daily. (AR 363). On an August 8, 2013 report for a psychiatric evaluation, the doctor noted that Plaintiff stated he "drank alcohol and used marijuana [after his divorce], as he had when he was an older adolescent/young adult. Pt. denies a history of other illicit drug use and reports he is not drinking more than once or twice a month at this time." (AR 360),

On July 15, 2013, Plaintiff went to the Emergency Room at Riverside County Regional Medical Center. (AR 346). He complained of generalized weakness, depression, and having a reaction to medication. (AR 346). The notes describe Plaintiff as having a flat affect. (AR 347). The doctor ordered an echocardiogram ("ECG") which revealed sinus bradycardia and ST junctional depression nonspecific. (AR 347).

On September 3, 2013, Plaintiff saw Dr. Yi-Pin Cheng at Riverside County Regional Medical Center. (AR 336). Plaintiff requested pain pills for joint pain. (AR 343). Plaintiff claimed he normally receives 180 pills per month. (AR 343). Dr. Cheng noted Plaintiff had chronic pain in his back, knee, and hip but did not have saddle anesthesia. (AR 344). Dr. Cheng wrote "[e]ncourage exercise and lose weight." (AR 344). Dr. Cheng partially renewed Plaintiff's prescriptions for hydrochlorothiazide, tramadol, and amlodipine. (AR 336). However, Dr. Cheng advised Plaintiff he needed to return to his primary care provider to obtain a full refill of his pain pills. (AR 343). Dr.

Cheng observed Plaintiff was properly oriented and displayed the appropriate mood and affect. (AR 344).

On September 18, 2013, Plaintiff sought treatment at the Family Care Clinic at Riverside County Regional Medical Center. (AR 337). He complained of rectal bleeding which he reported had been ongoing for the last six months. (AR 337). Additionally, he reported a history of right knee pain resulting from an injury to his ACL when he was 19 years old. (AR 337). Plaintiff also said he felt "achy" and "heavy." (AR 337). During this visit, the clinic noted Plaintiff had "normal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (AR 338). The clinic further noted Plaintiff was properly oriented, exhibited normal judgment and demonstrated "the appropriate mood and affect." (AR 339). The clinic found Plaintiff was stable and noted "no need for admission based on symptoms and vitals." (AR 339). The clinic took an x-ray of Plaintiff's knee, referred him to physical therapy, and continued his medication. (AR 339).

The x-ray taken of Plaintiff's knee on September 18, 2013 revealed no acute problems with the knee. (AR 409). The x-ray included three views of the knee. (AR 409). The doctor found the knee was "unremarkable" but did state a joint effusion could not be excluded based on the x-rays. (AR 409).

On March 25, 2014, Plaintiff completed a physical therapy questionnaire for Cure Physical Therapy and Wellness Center ("Cure

PT"). (AR 488). He was referred to Cure PT by Dr. Sharif. (AR 489). Plaintiff complained of back, hip, right knee and right wrist pain. (AR 488). In response to the question "Approximately when did your current complaints start?" Plaintiff wrote "Approx. 1 yr. ago." (AR 488). He attended physical therapy from March 25 through July 30, 2014 for a total of thirteen sessions. (AR 489-503).

On July 9, 2014, Plaintiff underwent an x-ray of his abdomen and an ultrasound of his kidneys. (AR 616-17). The doctor found the results of the x-ray showed "[m]ild degenerative changes of the bilateral hips and pubic symphysis" but were non-definitive regarding kidney stones. (AR 617). The doctor found the results of the ultrasound were most compatible with nonobstructing left renal stones. (AR 616).

On July 18, 2014, Plaintiff underwent an x-ray of his right shoulder. (AR 612). The x-ray revealed "inferior acromial osteophyte". (AR 612). On September 8, 2014, Plaintiff completed a physical therapy questionnaire for Cure PT. (AR 504). He complained of right shoulder pain. (AR 504). He stated his current complaint started one month prior. (AR 504). He attended physical therapy for his right shoulder from September 8 through December 19, 2014 for a total of 9 visits. (AR 505-13).

On October 16, 2014, Plaintiff underwent an x-ray of his lumbar spine. (AR 595). Three views revealed mild osteoarthritic changes at L4-5 including disc height loss and mild

anterolisthesis. (AR 595). The x-rays also revealed mild levoscoliosis of the lumbar spine centered at L3. (AR 595).

On January 15, 2015, Plaintiff had an initial evaluation for physical therapy at "Cure PT". (AR 514). He was referred to Cure PT by Dr. Sharif. (AR 515). He complained of lower back pain. (AR 514). He reported he had experienced this pain since he was 19 years old but that it began to increase 2 years ago. (AR 514). He attended physical therapy for his lower back from January 15 through May 1, 2015 for a total of 9 visits. (AR 522).

On March 5, 2015, Plaintiff underwent an x-ray of his right hip. (AR 584). The x-ray impression was "normal right hip". (AR 584).

On May 12, 2015, Plaintiff received an injection to his right hip to help alleviate pain. (AR 570-72). He also received a recommendation for physical therapy for his right hip. (AR 573). On June 25, 2015, Plaintiff completed a physical therapy questionnaire for "Cure PT". (AR 523). He complained of hip and lower back pain. (AR 523). The physical therapist felt Plaintiff's right hip should be the focus of treatment because of possible bursitis. (AR 524). Plaintiff's record shows he started physical therapy for his right hip on June 25, 2015 with recommended treatment to last for four weeks with two visits per week. (AR 524). The physical therapist observed that Plaintiff had treatment with the "Cure" facility previously, which "[Plaintiff] notes has provided good relief." (AR 524).

## B.    <u>Treating Physician Opinion</u>

On June 26, 2015, Plaintiff's treating physician, Dr. Subhi Sharif, filled out a medical opinion form related to Plaintiff's physical ability to do work-related tasks. (AR 663-65). He stated that Plaintiff can occasionally lift ten pounds or less.    (AR 663). He indicated that Plaintiff can stand and walk for less than two hours and can sit for less than two hours during an eight-hour day with normal breaks. (AR 663). Dr. Sharif further qualified that Plaintiff can only stand for ten minutes and sit for fifteen minutes before needing to alter position to relieve discomfort. (AR 663). He stated that Plaintiff needs to walk around every fifteen minutes and he needs to be able to alternate freely between sitting and standing. (AR 664). Dr. Sharif also indicated Plaintiff would need to lie down "several times a day" during working hours. (AR 664). According to Dr. Sharif, Plaintiff can only occasionally twist, stoop, crouch, and climb stairs and can never climb ladders. (AR 664). Plaintiff's ability to reach, handle, feel, and push/pull are impaired. (AR 664). His ability to finger or use fine manipulation is not impaired. (AR 664). He has no restriction on exposure to wetness. (AR 665). He needs to avoid even moderate exposure to humidity, noise, and fumes, odors, dusts, gases, poor ventilation, etc. (AR 665). Dr. Sharif opined that Plaintiff would miss work more than three times a month as a result of his impairments. Finally, Dr. Sharif believes that Plaintiff must avoid all exposure to extreme cold and heat and hazards such as machinery and heights. (AR 665).

Dr. Sharif found all of these restrictions were based on Plaintiff's "significant bone degeneration[,] the slipped disks in vertebrae[,] arthritis in spine[, and] pain (chronic)." (AR 664). Additionally, Dr. Sharif stated Plaintiff has depression which causes anxiety and his chronic pain restricts him from working. (AR 665). Dr. Sharif is a general practitioner. (AR 559).

## C. **State Agency Doctors**

### 1. **Initial Level Residual Assessment**

On January 9, 2014, State Agency Medical Consultant Dr. A. Wong completed the Residual Assessment of Plaintiff. (AR 75-84). For the physical limitations assessment, Dr. Wong found Plaintiff can occasionally lift 50 pounds and can frequently lift 25 pounds. (AR 83). Dr. Wong also found Plaintiff can stand and/or walk about 6 hours in an 8-hour work day and can sit for about 6 hours in an 8-hour workday. (AR 83). Dr. Wong found the Plaintiff can push and/or pull subject to the lifting limitations. (AR 83). Dr. Wong found Plaintiff's postural limitations were such that he can frequently climb ramps, ladders and stairs, balance, stoop, kneel, crouch and crawl. (AR 83-84). Dr. Wong did not find any manipulative, visual, communicative or environmental limitations. (AR 84).

## 2. Reconsideration Level Residual Assessment

On March 13, 2014, State Agency Medical Consultant Dr. Mazuryk completed the Residual Assessment of Plaintiff at the reconsideration level. (AR 88-101). Dr. Mazuryk found Plaintiff had the same exertional limitations as the initial level Residual Assessment except that Plaintiff could only occasionally lift 20 pounds and frequently lift 10 pounds. (AR 97). Dr. Mazuryk found that Plaintiff can sit, stand and walk about 6 hours in an 8-hour work day. (AR 97). For Plaintiff's postural limitations, Dr. Mazuryk found Plaintiff could only occasionally climb ramps, ladders and stair, balance, stoop, kneel, crouch and crawl. (AR 97). Dr. Mazuryk found no manipulative, visual or communicative limitations. (AR 97). However, Dr. Mazuryk did find environmental limitations. (AR 97). Dr. Mazuryk stated Plaintiff needed to avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery and heights. (AR 98). Dr. Mazuryk explained that Plaintiff needed to avoid cold and vibration because it could exacerbate his pain. (AR 98). Dr. Mazuryk further stated Plaintiff should avoid uneven terrain because it might cause his right knee might to become unstable. (AR 98).

Overall, the State Agency doctors at the reconsideration level found Plaintiff was not disabled and had the residual functional capacity to perform light work. (AR 94, 100). Dr. Mazuryk found Plaintiff could perform some of his past relevant work. (AR 99-100).

3

## D.   **Orthopedic Consultant**

Dr. Vicente R. Bernabe, a board certified orthopedic surgeon, examined Plaintiff on December 13, 2013. (AR 418-23). Plaintiff reported low back, right hip and right knee pain. (AR 418). He stated he "tore his right knee" when he was 19 but did not have surgery to repair it and has experienced pain since then. (AR 418). He also stated his current treatment only involved pain medications including Tramadol. (AR 418). He reported occasionally using a cane but not a knee brace. (AR 418). The doctor further noted Plaintiff's family history included his father having "arthritis and bone and joint disease." (AR 419).

Dr. Bernabe concluded Plaintiff had "lumbar musculoligamentus strain, internal derangement of the right knee, and greater trochanteric bursitis of the right hip." (AR 422). The doctor observed Plaintiff could walk without a cane and perform a fifty percent squat. (AR 419). The doctor found Plaintiff was "tender at the lumbosacral region" and observed a paravertebral muscle spasm on Plaintiff's left side. (AR 420). However, the straight-leg raise test returned negative results bilaterally both in the seated position to 90 degrees and the supine position. (AR 420). Plaintiff's right shoulder had the same range of motion as his left shoulder. (AR 420). He also had a negative cross arm adduction test. (AR 420). The doctor found Plaintiff's right shoulder had no instability. (AR 420). Plaintiff experienced pain when Dr. Bernabe palpated his right hip along the greater trochanter area. (AR 421). However, the doctor found Plaintiff's range of motion

in both hips was within normal limits. (AR 421). His right knee had 1+ effusion and tenderness at the medial patella femoral joint line with crepitus. (AR 421). However, the doctor found Plaintiff's right knee ligament appeared to be stable. (AR 421).

Dr. Bernabe took two radiological views of Plaintiff's lumbar spine, right knee and right hip each. (AR 422). The views of the lumbar spine revealed straightening of the lumbar lordosis. (AR 422). However, Plaintiff's intervertebral disc spaces were preserved and there was no compression fracture or dislocation. (AR 422). The views of the right knee showed no findings. (AR 422). The views of the right hip also resulted in no findings. (AR 422).

Dr. Bernabe completed a functional assessment of Plaintiff. (AR 422). He opined that Plaintiff can lift and carry 50 pounds occasionally and 25 pounds frequently. (AR 422). He found no limitations on Plaintiff's pushing and pulling abilities. (AR 422). He opined that Plaintiff can walk and stand for six hours out of an eight-hour work day. (AR 422). He further opined that Plaintiff can sit for six hours out of an eight-hour work day. (AR 422). He also found Plaintiff can bend, kneel, stoop, crawl and crouch frequently and can walk on uneven terrain, climb ladders and work at heights frequently. (AR 422).

# IV.

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[3] and that is expected to result in death or to last for a continuous period of at least twelve months. <u>Reddick v. Chater</u>, 157 F.3d 715, 721 (9th Cir. 1998)(citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999)(citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2) Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3) Does the claimant's impairment meet or equal one of a list

---

[3] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b) − 404.1520(f)(1) & 416.920(b) − 416.920(f)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity,[4] age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20

---

[4] Residual functional capacity is "what [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence."  20 C.F.R. §§ 404.1545(a), 416.945(a).

17

C.F.R. §§ 404.1520(g)(1), 416.920(g)(1) (2017). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000)(citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

**V.**

**THE ALJ'S DECISION**

The ALJ used the above five-step process and found Plaintiff was not disabled according to the Social Security Act. (AR 19-31). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from the application date of August 29, 2013. (AR 21). At step two, the ALJ found Plaintiff had following severe impairments:

> "pain in the hip, knees, and back; lumbar musculoligamentous strain; internal derangement of the right knee; and greater trochanteric bursitis of the right hip."

(AR 21). The ALJ further found Plaintiff's hemorrhoids with rectal bleeding, hypertension and depressive disorder with anxiety were nonsevere impairments. (AR 21-23).

At step three, the ALJ found Plaintiff's impairments did not meet or medically equal in whole or in part any of the specific impairments as required under this step of the process. (AR 24). Next, the ALJ determined Plaintiff's residual functional capacity for use in steps four and five. (AR 25-31). The ALJ found Plaintiff had the RFC to perform light work with certain exceptions:

> "the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently; he can stand and/or walk for six hours out of an eight-hour work day with regular breaks; he can sit for six hours out of an eight-hour workday with regular breaks; he can occasionally climb ramps and stairs; he can occasionally climb ladders, ropes, and scaffolds, stoop, balance, kneel, crouch, and crawl; he is precluded from concentrated exposure to extreme cold, wetness, vibration, uneven terrain and hazards including machinery and unprotected heights." (AR 25).

Based on this residual functional capacity, at step four the ALJ found Plaintiff is capable of performing some of his past relevant work. (AR 30). Thus, the ALJ found Plaintiff was not disabled under the Social Security Act. (AR 31).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the

record as a whole.  Garrison v. Colvin, 759 F.3d 995 (9th Cir. 2014)(citing Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006); Auckland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001)(citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)(citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance."  Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion."  Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279).  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Auckland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner.  Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

## VII.

## DISCUSSION

Plaintiff contends the ALJ failed to properly consider the opinion of treating physician, Subhi Sharif, M.D.  (Memorandum In Support Of Plaintiff's Complaint ("MSC"), Dkt. No. 21, at 2-6).

Specifically, Plaintiff argues that "the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for rejecting" Dr. Sharif's opinion. (Id. at 4).

The Court disagrees with Plaintiff's contentions. The ALJ provided specific and legitimate reasons supported by substantial evidence for rejecting Dr. Sharif's opinion. Accordingly, the ALJ's decision must be AFFIRMED.

**The ALJ Provided Specific And Legitimate Reasons To Reject Plaintiff's Treating Doctor's Opinion**

As a matter of law, the greatest weight is accorded to the claimant's treating physician. Ghanim v. Golvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014). The opinions of treating physicians are entitled to special weight because the treating physician is hired to cure and has a better opportunity to know and observe the claimant as an individual. Id. Further, as a general rule, when a treating or examining physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons. See Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir. 2017). The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts. Trevizo, 871 F.3d at 675.

When a treating or an examining physician's opinion is contradicted by another doctor, it may only be rejected if the ALJ provides "specific and legitimate" reasons supported by substantial evidence in the record. See Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014); see also Orn v. Astrue, 495 F.3d 625, 633 (9th Cir. 2007).

Here, Consultative Examiner Vincente Bernabe, D.O., and the State Agency Medical Consultants contradicted treating doctor Sharif's opinion. (Compare AR 663-65 with AR 82-84, 96-98 and 418-23). Dr. Sharif opined that Plaintiff can lift and carry 10 pounds at most, and can sit, stand, and walk 2 hours in an 8-hour day. (AR 663). Consultative examiner Dr. Bernabe and the State Agency Medical Consultants opined Plaintiff can lift and carry at least 20 pounds occasionally, and can sit, stand, and walk 6 hours in an 8-hour day. (AR 83, 97, and 422). Because of the conflicting opinions, the ALJ is required to provide "specific and legitimate" reasons for rejecting Dr. Sharif's opinion.

The Court finds that the ALJ provided specific and legitimate reasons supported by substantial evidence for rejecting Dr. Sharif's opinion. Specifically, in the written decision, the ALJ summarized the objective medical evidence prior to assigning weight to the opinions of the physicians. In assigning little weight to Dr. Sharif's opinion, the ALJ provided three specific and legitimate reasons.

First, the ALJ explained that Dr. Sharif's opinion is "grossly [inconsistent] with the x-rays contained in the record, which revealed no more than mild findings." (AR 29). There is sufficient evidence in the record to support the ALJ's determination. With regard to Plaintiff's hip, x-rays taken in 2013 and 2015 both revealed a "Normal right hip." (AR 422, 584). Similarly, x-rays of plaintiff's right knee taken in September and December 2013 revealed unremarkable findings. (AR 409, 422). Plaintiff had x-rays performed of his right shoulder, which revealed that he had "inferior acromial osteophyte," but there is no evidence that Plaintiff received more than routine physical therapy treatment for any shoulder pain. (AR 612). Finally, X-rays of Plaintiff's lumbar spine also yielded unremarkable findings. X-rays taken in 2013 revealed that Plaintiff had a "straightening of the lumbar lordosis" but his lumbar spine was otherwise normal. (AR 422). X-rays taken on October 16, 2014 revealed that Plaintiff had only mild osteoarthritic changes and mild levoscoliosis. (AR 595). These largely unremarkable x-ray results do not support Dr. Sharif's extremely limiting opinions. Accordingly, the x-ray results are a specific and legitimate reason for rejecting Dr. Sharif's opinion.

Second, the ALJ rejected Dr. Sharif's opinion because it was "inconsistent with the general benign findings from the orthopedic consultative examination." (AR 29). Plaintiff argues that this is not a specific and legitimate reason because the ALJ gave little weight to the consultative examiner's opinion. (MSC at 6). Plaintiff's argument lacks merit because the ALJ did not reject

Dr. Sharif's opinion based on the consultative examiner's opinion. Instead, the ALJ found that Dr. Sharif's opinion was inconsistent with the "benign findings" of the consultative examination. (AR 29). There is sufficient evidence in the record to support the ALJ's determination. The consultative examiner performed a physical examination, which reflected that Plaintiff was in "no acute or chronic distress." (AR 419). Further, Plaintiff does not use a brace. (AR 418). Although Plaintiff claims to use a cane, it is "not medically necessary." (AR 419). The consultative examiner observed plaintiff ambulate without a cane and walked unassisted. (AR 419). The examination of Plaintiff's spine and extremities was largely unrevealing. (See AR 420-21). Finally, as mentioned above, the consultative examiner performed x-rays of Plaintiff's lumbar spine, right knee, and right hip, which all yielded unremarkable findings. (AR 422). These benign findings do not support Dr. Sharif's extremely limiting opinions. Accordingly, the benign findings of the consultative examination are a specific and legitimate reason for rejecting Dr. Sharif's more limiting opinion.

Third, the ALJ wrote that it appears Dr. Sharif was "sympathetic" to Plaintiff as Dr. Sharif's opinions are not "supported by the longitudinal treatment notes." (AR 29). While Plaintiff challenges the ALJ's comment that Dr. Sharif was "sympathetic" to Plaintiff as an improper basis to reject a treating doctor, Plaintiff overlooks the entire reason provided by the ALJ. The ALJ expressly stated that the "longitudinal treatment

notes" do not support the degree of limitation suggested by the treating doctor.

Reliance upon the longitudinal treatment notes -- essentially the totality of Plaintiff's treatment history -- was a specific and legitimate reason to reject Dr. Sharif's extremely limiting opinion. When completing the questionnaire regarding Plaintiff's physical capability, Dr. Sharif did not distinguish any of the treatment notes or contrary test results to explain his determinations. Instead, Dr. Sharif repeatedly listed "pain" as the reason for the limitations. (See AR 664-65). The longitudinal treatment notes show that Plaintiff received physical therapy and pain medication for his symptoms, but the treatment notes themselves fail to support the degree of limitation suggested by Dr. Sharif. Accordingly, the conflict with the treatment record was a specific and legitimate reason for rejecting Dr. Sharif's opinion.

\\\
\\\
\\\
\\\
\\\
\\\
\\\
\\\

**VIII.**

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: December 5, 2017

/S/
_____

SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS OR ANY OTHER LEGAL DATABASE.**